UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| AIRFLOAT, LLC, | ) |
| Plaintiff, | ) 09-2187 |
| v. | ) |
| PAT WHITE, individually and d/b/a AIRFLOAT SYSTEMS UK, | ) |
| Defendant. | ) |

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Eminent jurist Learned Hand once observed, "I must say that, as a litigant, I should dread a lawsuit beyond almost anything short of sickness and death." The quotation captures succinctly the tenor of this case, where the defendant, Pat White ("White"), has defended *pro se* the claims of the plaintiff, Airfloat, LLC ("Airfloat"), under the Lanham Act, 15 U.S.C. § 1051 *et seq*. White filed a counterclaim alleging that Airfloat violated the Lanham Act by, among other things, misleading a customer of White's and diverting the sale from White to Airfloat. White claims that this litigation has caused pain, suffering and stress which have exacerbated his cardiac condition, for which he was hospitalized during the pendency of this dispute. White alleges that despite having presented Airfloat with "certified mail containing verifiable medical certificates," Airfloat relentlessly sought to ruin his health and destroy his business.

The parties have filed cross-motions for summary judgment. For the following reasons, White's motion [85] is denied. Airfloat's motion [86] is granted, with some remedies to be determined after further briefing.

BACKGROUND

White is a citizen of the United Kingdom who has resided primarily in South Africa and England and, since early 2009, in the United States. White had a long-standing business relationship with Decatur, Illinois-based Airfloat Systems (the "predecessor"). Under an arrangement with the predecessor, White did business in the United Kingdom as Airfloat Systems UK ("Airfloat UK"). In 2005, JLS Acquisition Group, LLC ("JLS"), purchased substantially all the assets of the predecessor, including its accounts receivable. The name was changed to Airfloat. Like its predecessor, Airfloat is also located in Decatur, Illinois.

The predecessor's accounts receivable included some $17,000 owed by White. JLS's Jason Stoecker ("Stoecker") claims that he understood that White was no longer affiliated with the predecessor, who was ignoring White's "pie in the sky" ideas because White had disappeared and had not been paying his bills.

Stoecker and White communicated by email after the acquisition, with Stoecker hoping to collect the sum owed by White.  In September 2005, Stoecker and White discussed the idea of White becoming either an outside sales representative or a distributor for Airfloat.  The discussions were fruitless and soon ended.  Things improved a bit by 2009.  In the middle of 2009, White contacted Airfloat stating that he had a buyer "in Europe" for 152 Airfloat air bearings.  White stated, "The customer is chasing and I am thinking 'buy American', in the light of our current truce it makes sense."  Stoecker said that he would work up a quote.  Stoecker also asked, "What country are these Air Bearings for?  And is the qty really 152 items?  Wow .. That's a big order."  White replied that the customer was doing a job on a production line in Thailand.  Stoecker learned that the customer was Myande, a Chinese company that had contacted Airfloat directly some months before it had contacted White.  Airfloat then commenced this case against White pursuant to the Lanham Act.

When deposed, White asserted that by buying the predecessor's assets, Stoecker inherited an obligation to continue selling products to White, or to customers of White's, for which White would receive a commission.  He contends that he spent much time and money building his business as Airfloat UK, and claims that Stoecker "wants to take over [Airfloat UK's] name in Europe and he wants to take over my hard work that I put in that he just cancelled out when he took over the company."  White Dep. 158.

## ANALYSIS

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Any discrepancies in the factual record should be evaluated in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."  *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2000).  A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial."  *See* Fed. R. Civ. P. 56(e).  "A party [opposing] summary judgment is required to 'wheel out all its artillery to defeat it.'"  *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (*quoting Employers Ins. of Wausau v. Bodi-Wachs Aviation Ins. Agency, Inc.*, 846 F. Supp 677, 685 (N.D. Ill. 1994)).  "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]."  Fed. R. Civ. P. 56(e).

Where, as here, the parties have filed cross-motions, the court addresses each motion separately, viewing the evidence in the light most favorable to the non-movant.  *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 500 (7th Cir. 2008).  If there is no *genuine* issue of material fact "and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal*

*Practice and Procedure* § 2720 (3d ed.).

As a *pro se* litigant, White is exempt from the provisions of Local Rule 7.1(D). *See* CDIL-LR 7.1(D)(6). However, on summary judgment, the Federal Rules of Civil Procedure require any party to present admissible evidence to support or oppose the motion. *See* Fed. R. Civ. P. 56; *Berry v. Chicago Transit Authority*, 618 F.3d 688, 690 (7th Cir. 2010). Argument alone, without citation to admissible evidence, is insufficient. *See Scherer v. Rockwell Intern. Corp.*, 975 F.2d 356, 361 (7th Cir. 1992).

## I. White's motion

White has moved for summary judgment. The court must view his evidence in the light most favorable to the nonmovant, Airfloat. *McKinney*, 548 F.3d at 500.

White claims that he is entitled to summary judgment because the Lanham Act does not apply to him. He argues that he is a citizen of the UK who does not do business in the United States and does not actively solicit business from the United States. White argues that the Lanham Act does not extend beyond the borders of this country, and it does not apply to non-citizens who are alleged to have infringed and whose conduct does not have a substantial effect on United States commerce. Therefore, he concludes that this court lacks jurisdiction.

In response, Airfloat cites the deposition testimony of White and Stoecker to show that White is married to a United States citizen and during the relevant time period was living in the United States. During that time, he maintained websites with the domain names www.airfloatsystems.com and www.airfloat.co.uk. Through these websites, Myande contacted White, hoping to purchase a large quantity of Airfloat's air bearings. Then White sought a quote from Airfloat for the desired product. Email printouts show that Stoecker sought additional information from White because the quantity desired was so large.

At his deposition, Stoecker identified Exhibit 25 as the document that White presented to Airfloat. The document appears to be an incomplete purchase order for 152 Airfloat air bearings. Stoecker testified, "It's the same document we received from the customer months earlier in our direct correspondence with them. And we then called the customer to confirm that it was not a purchase order. And [White] had no such purchase order or deposit with the customer. So then we notified [White] that [White is] not selling our product." Stoecker Dep. 98-101.

Exhibit 26 to Stoecker's deposition is White's letter to Myande. The logo at the top of the first page is Airfloat's logo,[1] modified by White to add the word, "Systems." The last page

---

[1] The logo is a combination of the name "Airfloat" and artwork depicting its product. The United States Patent and Trademark Office ("USPTO") defines a trademark as "any word, name, symbol or device, or any combination, used, or intended to be used, in commerce to identify and distinguish the goods of one manufacturer or seller from goods manufactured or sold by others, and to indicate the source of the goods. In short, a trademark is a brand name." *A company does*

3

of Exhibit 26 shows Airfloat's logo (again, with White's addition of the word, "Systems") and at the bottom, above White's contact information, is Airfloat's circular symbol comprised of three arrows (the "circular symbol"). White refers to the air bearings as "our Airfloat air bearing H-0020." White's contact information includes two telephone numbers – one in Illinois and the other in Massachusetts.[2]

In his reply, White disputes several of Airfloat's allegedly undisputed material facts. However, he does not provide admissible evidence. "Argument is not evidence[.]" *Scherer*, 975 F.2d at 361. The reply is limited by the Local Rules to the matters raised in Airfloat's response. White argues that email between two non-U.S. persons using email hosted by a server outside the U.S. cannot be considered "conducting business in the United States." This argument is unavailing. While residing in the United States, White used Airfloat's logo and circular symbol on his communication with Myande, referred to the product as "our Airfloat bearings," and provided Myande with two telephone numbers at which he could be reached, both of which were in the United States. Viewed in the light most favorable to Airfloat, there is compelling evidence

---

*not have to register its trademark*, "but federal registration has several advantages, including notice to the public of the registrant's claim of ownership of the mark, a legal presumption of ownership nationwide, and the exclusive right to use the mark *on or in connection with the goods or services set forth in the registration.*" *See* http://www.uspto.gov/faq/trademarks.jsp#DefineTrademark (emphasis added). Airfloat's registered trademark was administratively canceled in 2005 for failure to file a Declaration of Continued Use.

As discussed elsewhere in this order, Airfloat Ltd. (a company not owned by either Stoecker or White) has a USPTO-registered trademark for the name "Airfloat" – for use on and in connection with "modular substantially non-metallic pontoon systems" and similar items (trademark international classification 019). In contrast, Airfloat's trademark had in the past been registered for use on and in connection with "metal air casters, air rollers and air wheels" (international classification 006). Other companies have in the past registered an Airfloat trademark for use on and in connection with such items as water mattresses (international classification 020), and packing materials (international classification 016). *See* http://tess2.uspto.gov/bin/showfield?f=toc&state=4009%3Ah7c62b.1.1&p_search=searchss&p_L=50&BackReference=&p_plural=yes&p_s_PARA1=&p_tagrepl%7E%3A=PARA1%24LD&expr=PARA1+AND+PARA2&p_s_PARA2=airfloat&p_tagrepl%7E%3A=PARA2%24COMB&p_op_ALL=AND&a_default=search&a_search=Submit+Query&a_search=Submit+Query. This illustrates the point that when a company has a registered trademark, it is valid only for business pertaining to goods and services in the international classification(s) specified in the registration.

[2] In email dated March 18, 2009, White stated to Stoecker, "I no longer reside in the UK." The message indicated that White's email address was innovations@airfloat.co.uk and his signature block included the addresses pat.white@airfloat.co.uk and http://www.airfloat.co.uk. Stoecker Dep. Ex. 19.

that White actively engaged in business as Airfloat while living in the United States.

White cites cases pertaining to extraterritorial jurisdiction, venue, and so forth. These cases do not stand for the proposition that the Lanham Act is inapplicable to a foreign citizen/legal U.S. resident doing business in this country. White's motion for summary judgment [85] is denied.

## II. Airfloat's motion

Airfloat has also filed a motion for summary judgment. Any factual discrepancies in its motion must be viewed in the light most favorable to White. *McKinney*, 548 F.3d at 500.

Airfloat alleges unfair competition and deceptive trade practices under the Lanham Act. "*In addition to protecting registered marks*,[3] the Lanham Act, in § 43(a), gives a producer a cause of action for the use by any person of '*any* word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship or approval of his or her goods[.]'" *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000); 15 U.S.C. §1125(a) (emphasis added). The general purpose of the law of unfair competition "is to prevent one person from passing off his goods or his business as the goods or business of another." *Hesmer Foods, Inc. v. Campbell Soup Co.*, 346 F.2d 356, 358 (7th Cir. 1965).

The elements of a claim under § 43 of the Lanham Act are: (1) a protectable trademark, and (2) "that the relevant group of buyers is likely to confuse the alleged infringer's products or services with those of the plaintiff." *H-D Michigan, Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 759 (7th Cir. 2007).

### A.

As to the first element, Airfloat and its predecessor have long used the Airfloat name to identify their goods. The predecessor began to use the trade name "Airfloat" in 1967 and registered the Airfloat trademark in 1995. The predecessor used the name continuously until it sold its Airfloat division to JLS in 2005. Among the assets transferred were "all trade names, including the names Airfloat Systems and Airfloat Industrial Distribution or any configuration or display thereof, trademarks, [and] service marks[.]" JLS renamed the entity Airfloat, LLC, and it has continued to do business as Airfloat, despite the fact that the trademark was administratively cancelled in 2005 for failure to file renewal paperwork. Although White also used the name in the United Kingdom, it was with the predecessor's authorization, and he has not presented any facts or documents to show that he had the same authorization from Airfloat.

White argues that he uses phrases that describe a generic product: an air bearing caster. As White describes it, "the air bearing casters using compressed air lift the load on cushions of

---

[3] Thus, Airfloat need not show that its mark is registered to invoke protection under this section of the Lanham Act.

5

air and thus free of normal friction facilitating easy movement." A number of companies manufacture air bearing casters; Airfloat is one such manufacturer. White has not submitted any evidence to show that the term "airfloat" is used generically by any other air bearing caster companies or that those companies refer to their products as Airfloat products. The court concludes that Airfloat's marks and symbols are protectable.[4]

B.

The second element is the likelihood of confusion as to origin, sponsorship or approval of the goods in question. *H-D Michigan*, 496 F.3d at 759. This element may be shown by either actual consumer confusion or likelihood of deception. *Hesmer*, 346 F.2d at 359. "While there are a myriad of variables to be considered in determining whether a likelihood of confusion exists, the most important factors include the similarity of the marks, the intent of the claimed infringers, and the evidence of actual confusion." *G. Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 999 (7th Cir. 1989).

1. Actual confusion

Airfloat states that on or about July 6, 2009, Myande contacted White, believing him to be affiliated with Airfloat. Airfloat offers three allegedly undisputed facts to show that Myande was actually confused.

"12. On or about July 6, 2009, one of Airfloat LLC's customers [Myande] contacted White believing him to be an agent of or otherwise affiliated with Airfloat LLC. *See* Ex. C. at 100-101 (Stoecker Dep.).

13. White told the customer he was affiliated with Airfloat LLC. *See* Ex. C. at Ex. 26 (Stoecker Dep.).

14. At the time the customer contacted White, the customer had already been in contact with Airfloat LLC about purchasing a large quantity of air bearings. *See* Ex. C. at 100-101 (Stoecker Dep.)."

These three allegedly undisputed facts do not show that Myande was confused as to origin, sponsorship or approval of the goods in question. Moreover, the citations to the record do not support the conclusions presented in the allegedly undisputed facts.

---

[4] The court is unpersuaded by White's assertion that UK and European Union authorities declined to register the trademark "Airfloat" because it was descriptive and devoid of any distinctive character. The USPTO, on February 24, 2009, registered the trademark and service mark "Airfloat" to Airfloat Limited (United Kingdom Company). *See* Stoecker Dep. Ex. 2. The trademark was issued for use within the designated class: modular non-metallic pontoons and related products. Airfloat's air caster bearings are steel, as White acknowledged in his July 6, 2009, email: "shipping steel has always made stuff expensive." Stoecker Dep. Ex. 23.

6

Exhibit 26 is a copy of White's correspondence to Myande with a quote for 152 Airfloat air bearings, in which White indicates an affiliation with Airfloat. But at that time, White actually was trying to fulfill the Myande order with Airfloat air bearings. On July 1, 2009, Stoecker emailed White that "it might be of mutual benefit to allow you to work with us on . . . specific sales." Stoecker Dep. Ex. 17. The Myande quote and cover letter are undated but in view of other evidence they appear to have been sent sometime between the time that White received a price for the requested product (July 7) and the time that Myande returned the incomplete purchase order for Airfloat products to White (July 11). Stoecker Dep. Ex. 24- 25, 30. If Myande believed, from July 3 to July 11, that White was "affiliated" with Airfloat, it would not be an unwarranted belief because, to White's knowledge, he and Airfloat were actively engaged in an attempt to provide Myande with Airfloat products.

Two days after White received the Myande purchase order, on July 13, White and Stoecker met in Boston. At the meeting, Stoecker told White to stop telling the customer that White was affiliated with Airfloat. The deposition testimony cited by the plaintiff relates to Stoecker's phone conversation with White a day or two after the Boston meeting. White called Stoecker to discuss Myande's purchase order. According to Stoecker, White allegedly told him that if Airfloat didn't work with him to fulfill the Myande order, White would sell clone air bearings to Myande and pass them off as Airfloat air bearings. Stoecker then told White that to protect the customer, White left him no choice but to provide him with Airfloat air bearings but would not do so until Stoecker saw the purchase order executed by the customer. When Stoecker received an incomplete and unsigned purchase order, he recognized the document as one that Airfloat had received "months earlier in direct correspondence" between Airfloat and Myande. Stoecker then notified White that he would not be selling Airfloat product to Myande. Stoecker Dep. 100-01. This conversation between Stoecker and White is not evidence of what Myande believed, and there is no evidence of what White represented to Myande after the July 13 meeting in Boston. The evidence presented does not support the conclusion that Myande was actually confused as to origin, sponsorship or approval of the goods in question.

"To establish a right to damages, actual deception must be shown. To obtain equitable relief, only a likelihood of consumer deception need be shown." *Hesmer*, 346 F.2d at 359; *see also Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 639 (7th Cir. 2003). Therefore, Airfloat is not entitled to damages based on the evidence it has submitted to the court.

### 2. Likelihood of confusion

Airfloat may also show that a potential customer would be "confused as to origin, sponsorship or approval of the goods in question." *Wal-Mart Stores*, 529 U.S. at 209. Airfloat attaches website printouts to show that White has been using logos and symbols depicting the Airfloat tradename on www.airfloat-mps.com, www.airfloatsystems.com and/or www.airfloat.co.uk. When deposed, White described how these websites operate under his control and are designed to attract potential customers for air bearing casters. The only inference to be drawn from his testimony is that his scheme is designed to confuse potential customers.

White is the U.S. contact for Airfloat MPS [Modular Pontoon Systems], a British

company (Airfloat Ltd.), which has a trademark registered with the USPTO to be used in connection with non-metallic modular pontoon systems. *See* Stoecker Dep. Ex. 2-3. The website for Airfloat MPS, www.airfloat-mps.com, uses an altogether different logo than that of Airfloat, promotes entirely different products, and provides White's contact information (with phone numbers in Illinois and Massachusetts). White claims that he has a distribution agreement with Airfloat MPS, and is working with that company, "exploiting that trademark in this country." White Dep. 21. Although this website may provide another way for White's past customers to locate him when in the market for air bearing casters, there is no indication on that website that Airfloat MPS sells air bearing casters. White claims that for twenty years he distributed air bearing casters in the United Kingdom as Airfloat UK, but he now sells air bearing casters in the United States as AerGlide. White Dep. 22-23. A June 2010 version of AerGlide's website, www.aerglide.com, does not refer to Airfloat except in reference to Airfloat MPS. It also refers to White's experience doing business as Airfloat CC in South Africa and boasts, "today he is AerGlide USA." White Dep. Ex. 18.

The other two websites are a different story. White explained how his various websites link to one another. If someone were to type in www.airfloatsystems.com, he or she would be redirected to http://www.airfloat.co.uk. White Dep. 40. And, according to White, the photos of products on that website are not Airfloat products; they are air bearing products made by another company located in the United States. White has affixed the AerGlide logo to the photos of some products shown on the website. *See, e.g.*, White Dep. 70.

The July 2009 version of the web pages from www.airfloat.co.uk boldly displays photographs of Airfloat equipment with the Airfloat logo and circular symbol. Throughout that version of the website, White uses Airfloat's logo or one that is substantially similar to the Airfloat logo. On some of the pages, White uses an almost identical logo with a slightly altered company name: "Airfloat *Systems*" or "Airfloat *UK*." The "Airfloat UK" logo is identical to Airfloat's logo, except for the addition of "UK." It is shown next to a photo of equipment clearly labeled as Airfloat equipment, and below this appears Airfloat's slogan: Innovations in Movement. On this website's Industry Overview page, White uses both the circular symbol and "Innovations in Movement." An August 2009 version of the web pages shows that White had changed his slogan to "innovative engineering in motion." *See* White Dep. Ex. 12-20.

A June 2010 version of the www.airfloat.co.uk website states that Airfloat UK "closed in April 2009 to facilitate the relocation to the USA where as a new enterprise we are redefining our product line and our manufacturing facilities using our extensive international experience to ensure the best price tag for our customers in the international market." White Dep. Ex. 5. Links from the main page take the viewer to other web pages showing air casters, air pallets, turntables, drive tractors, and an explanation about trademarks. On the trademark page, White complains about how the new owners of Airfloat deliberately began to use a name that was the same as, or similar to, the name he uses in order to take over the goodwill and a twenty-year history that White had developed in the European Union. He provides a link to the USPTO, showing that Airfloat Ltd./Airfloat MPS actually owns the Airfloat trademark. *See* Stoecker Ex. 5-11. As noted earlier, the trademark to which he refers is for use in connection with floating

pontoon systems and not metallic air bearing equipment.

White admitted his intent in redirecting potential customers from www.airfloatsystems.com to www.airfloat.co.uk and then to his U.S. company, AerGlide. "If I pick up customers in the United States then I get business, don't I?" He denies marketing products under the name Airfloat, but "I want the links, the links on the internet, to feed back to me. I have got – that's particularly why I have got that website and why I redirected it. So that I can get more hits on my website." He admits that he advertises that he manufactures Airfloat products in the United States, that he hopes to gain customers from the United States, and if he does, "I guarantee you I won't give them to Jason Stoecker." When asked if he would sell air bearing products to United States customers he'd lured through this series of websites, he agreed that he would. Eventually those customers would be redirected to www.aerglide.com, White's U.S. company. White Dep. 78-80.

What White describes is known as "initial interest" confusion. "Even if confusion as to the source of goods is dispelled by the time any sales are consummated," the Lanham Act prohibits "initial interest" confusion. *Dorr-Oliver, Inc. v. Fluid-Quip, Inc*., 94 F.3d 376, 382 (7th Cir. 1996). White makes no attempt to deny this devious attempt to divert Airfloat customers to his own company. He gives a number of reasons why he believes he is entitled to do so, but the question before the court is not whether, or why, White believes in this entitlement. The question is whether, through the process he describes, relevant buyers will be confused, at least initially, as to origin, sponsorship or approval of the goods in question. And there is solid evidence of the marks' similarity and White's intent.

No reasonable jury could find that White's web page addresses and the manner in which he redirects inquiries from one to another and then to the website for his United States company (which sells the same sort of product as Airfloat), would not be confusing to potential customers. Therefore, Airfloat is entitled to equitable remedies.

C.

Airfloat also moves for summary judgment on White's counterclaims. White asserts that Airfloat has violated the Lanham Act; misappropriated the Myande order that would have resulted in a profit to White of $54,000; and violated the copyright and confidentiality clause on White's email. White also seeks compensation from Airfloat for lost business since 2005 and for loss of future business; damages, loss of income, pain, suffering and stress from cardiac surgeries and the need for related ongoing medical care and medications; and reimbursement for costs incurred for subsistence and travel to and from the United Kingdom since July 2009.

Airfloat argues that several of White's counterclaims are not actionable, and that White lacks evidence to show that he is entitled to relief on his other counterclaims. In response, White argues that evidence of "the actual diversion" of lost Myande profits "is not yet available" and "will be sought during trial." But a nonmovant who cannot marshal his evidence to oppose summary judgment will not get to trial. Promises of evidence to come, and what it will prove, are insufficient.

White claims that "airfloat" is generic (contrary to his other assertions that he owns the right to use this name) and provides a photocopy of a letter from British authorities, which rejected Airfloat Ltd.'s application to trademark the name "Airfloat" in the United Kingdom. British authorities noted that in reference to the products for which the trademark was sought,

> classes 12 (pontoons), 19 (modular pontoon systems, pontoon supports of non-metallic materials; jetties; platforms; floating bridges; floats for marine use; parts and fittings for all the aforesaid goods); and 37 (construction, repair and maintenance services)[,]

the proposed trademark was descriptive and devoid of any distinctive character. *See* White Resp. Ex. C, d/e 91, p. 13-14. Whatever British authorities concluded about the use of the name for air-filled pontoon systems is irrelevant to the issues raised in this case. During all relevant times, White has resided, and has conducted business, in the United States. Nor is the court persuaded that because White marketed air bearing caster products for a number of years with permission from the predecessor to use the Airfloat name, Airfloat inherited the obligation to allow him to continue using the Airfloat name. Moreover, White's failure to use "wondrous phrases like 'tortuous [*sic*] interference with advantageous business relationships' or 'civilly unlawful diversion of contracts' or 'unfair and deceptive trade practices' or other word groups familiar to litigating attorneys" is not dispositive. It is not White's lack of knowledge of "wondrous phrases" but his failure to provide any admissible proof in support of each element of his counterclaims that is fatal to his case.

Airfloat's motion for summary judgment [86] is granted; however, without a showing of actual confusion, it is limited to equitable remedies. In addition to a permanent injunction, Airfloat seeks an accounting of White's contacts in connection with the two websites, an accounting of profits made from the sale of air bearing products since he began operating the two websites, and the costs of this action. Airfloat has not itemized its costs, nor has it cited any authority or presented argument to support that these remedies are warranted in view of the circumstances of this case, and in view of White's sworn deposition testimony that he has had one sale of air bearings at a $1,500 profit and that he is essentially insolvent.[5] The court will allow additional briefing on this matter.

## CONCLUSION

For the foregoing reasons, White's motion [85] is denied. Airfloat's motion [86] is granted; however, Airfloat is limited to equitable remedies.

White and/or his agents, servants, employees, successors and assigns are permanently enjoined from:
1. Infringing in any manner Airfloat's trademarks or otherwise competing unfairly with Airfloat;

---

[5] White Dep. 163-64, 166.

10

  2. Using the names "Airfloat" and/or "Airfloat Systems" or any of the related marks;
  3. Using the websites which White now operates (or has in the past operated) at http://www.airfloat.co.uk and http://www.airfloatsystems.com;
  4. Contacting, or encouraging others to contact, any of Airfloat's customers;
  5. Selling any domain name containing the word "Airfloat."

  Airfloat may file a brief in support of the other equitable remedies it seeks.  The brief shall be filed no later than December 17, 2010.  White's response shall be filed within twenty-eight days thereafter.

  Entered this 6th day of December, 2010.

         **s\Harold A. Baker**
         _____
         HAROLD A. BAKER
         UNITED STATES DISTRICT JUDGE